**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Action No.: 19-31 (RC) |
| | : | |
| RICHARD S. DEVAUGH, | : | Re Document No.: 25 |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

GRANTING DEFENDANT'S SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE

**I. INTRODUCTION**

Before the Court is Defendant Richard Devaugh's supplemental motion to suppress evidence, ECF No. 25. The relevant events occurred on January 14, 2019, when Mr. Devaugh was being surveilled by an undercover officer outside Strand Liquors in Northeast Washington, D.C. Based on the undercover officer's observations, a team of responding officers approached Mr. Devaugh, ordered him out of his vehicle, and detained him. Mr. Devaugh moves here to suppress drugs, a weapon, and other evidence obtained during the encounter. For the reasons explained below, the Court will grant the motion to suppress.

**II. BACKGROUND**

An initial motion to suppress evidence was filed on April 5, 2019. After Mr. Devaugh was appointed new counsel, the Court allowed a round of supplemental briefing and held a suppression hearing on November 4, 2019. At the hearing, the undercover officer (Officer Turner) and one of the responding officers (Officer Love) both testified; the Court found both

officers credible and gives their testimony substantial weight.¹ Additionally, body-worn cameras footage from four of the responding officers—Officers Gabster, Gordon, Love, and Lyon—was admitted into evidence.² At the close of the hearing, the Court gave the parties the opportunity to provide additional briefing, which they did. As indicated by the citations, the facts below are based on both the officers' testimony at the suppression hearing and the body-worn camera footage.

Testifying first was Officer Turner, an undercover officer currently assigned to the Narcotics Enforcement Unit of the Metropolitan Police Department (MPD). Suppression Hr'g Tr. ("Tr.") at 7, ECF No. 36. On January 14, 2019, he was conducting undercover observations from an unmarked vehicle parked on Division Avenue near the intersection with Foote Street, directly across the street from Strand Liquors. *Id.* at 9–10, 12. He was alone in his vehicle, but a group of other officers, including a so-called "arrest team," was working in coordination with him nearby. *Id.* at 12, 17. According to Officer Turner, this area—near Marvin Gaye Park—was well-known for high levels of drug activity. *See id.* at 8 ("So specifically at Division and Foote it's mainly known for heroin, but also crack cocaine, and they do sell marijuana up there."). Officer Turner had previously been called for "hundreds" of assignments there and had conducted "numerous" controlled purchases in the area. *Id.*

---

¹ Just for illustration, both officers burnished their credibility by freely providing testimony that did not advance the government's position. Officer Turner, for example, could not say whether he relayed certain key observations to his sergeant and the arrest team. Suppression Hr'g Tr. ("Tr.") at 72, 82, ECF No. 36. Officer Love admitted that (1) he had no reason to think that Mr. Devaugh was armed, Tr. at 119, and (2) that he probably would not have been able to tell, from a position outside of Mr. Devaugh's vehicle, that a particular object resting in the center console was actually a digital scale. Tr. at 128–29.

² *See* Defendant's Exhibits 23.1 ("Gabster BWC"), 23.2 ("Gordon BWC"), 23.3 ("Love BWC"), 23.4 ("Lyon BWC 1"), and 23.5 ("Lyon BWC 2") (the Lyon footage was split into two separate video files).

While seated in his vehicle around 3:00 p.m., Officer Turner saw someone—later identified as Mr. Devaugh—engage in a hand-to-hand transaction with an alleged buyer while the two were standing near a grey SUV parked nearby on Foote Street. Specifically, the buyer approached Mr. Devaugh, spoke with him briefly, handed him some money, and received in return "some small object or objects," which Officer Turner admitted he was unable to identify. *Id.* at 13–15. The buyer put the object(s) in a napkin, walked down Division Avenue, and entered Strand Liquors. *Id.* at 15–16. Mr. Devaugh also walked in that same direction, but remained outside the store. *Id.* at 16.

After observing the transaction, Officer Turner used his cell phone to call his superior officer, Sergeant Cardinal. *Id.* at 17. Officer Turner "was giving him updates, lookouts," which Sergeant Cardinal was in turn "transmitting to the arrest team" via radio. *Id.* Officer Turner announced: "Look, I have a drug transaction going down. I have a buyer and a dealer." *Id.* He gave descriptions of both individuals and relayed that the buyer had entered the store while the dealer was standing out front. *Id.*

At that point, a car travelling down Division Avenue pulled alongside Officer Turner's vehicle and came to a stop. *Id.* at 17–18. The driver rolled down his window, looked at Mr. Devaugh, and said "[t]he Feds are up the street." *Id.* at 18. Mr. Devaugh then walked back to the SUV, a fact which Officer Turner in turn relayed to Sergeant Cardinal. *Id.* at 19. As Mr. Devaugh was walking to the vehicle, Officer Turner noticed him "adjust[ing] his waistband area several times," which suggested to Officer Turner that he was "carrying a weapon or illegal firearm." *Id.* Mr. Devaugh entered the driver's side of the vehicle and remained behind the wheel until the arrest team arrived. *Id.* at 20.

3

Officer Love was a member of that arrest team. *Id.* at 91. As he testified, the team received a radio call from Sergeant Cardinal describing "two individuals that were believed to be involved in a drug transaction." *Id.* They responded to the intersection of Foote and Division, where they found Mr. Devaugh seated behind the wheel of the SUV. *Id.* at 92.

The actual encounter between Mr. Devaugh and the arrest team was recorded by multiple officers' body cameras. Officer Love's vehicle—an unmarked cruiser also carrying Officers Gabster, Lyon, and Banks—pulled in front of Mr. Devaugh's parked SUV. *Id.* at 91–93; Love BWC at 2:02-2:08. The officers turned on the unmarked cruiser's lights, exited the vehicle, and approached the SUV together. Tr. at 93. Officer Gabster, out in front of the group, held out his hand as he neared the driver's side of Mr. Devaugh's SUV; as he did so, a marked police SUV containing two additional officers (including Officer Gordon) drove up on his right side, stopping slightly behind Mr. Devaugh's vehicle. Love BWC at 2:08-2:15. Upon reaching Mr. Devaugh's car door, Officer Gabster issued a series of commands while making a variety of gestures, with Officer Banks occasionally interjecting as well: "No, no, hand back up . . . Alright, go ahead . . . Go ahead . . . Open the door or I'm gonna break that window . . . [Officer Banks: "Open the window."] . . . Open the door . . . [Officer Banks: "Open the door."]. . . Alright, I'll break it." *Id.* at 2:16-2:28. As this was unfolding, Office Lyon had made his way to the passenger's side of Mr. Devaugh's SUV. Lyon BWC 1 at 2:03-2:18. Immediately upon exiting his vehicle, he had told Mr. Devaugh "[l]et me see your hands," holding his arms above his head to illustrate. *Id.* at 2:03-2:06. As Officer Lyon reached the front passenger's window, he drew his firearm and displayed it against the glass. *Id.* at 2:18-2:25. And in the midst of Officer Banks's and Officer Gabster's commands, he chimed in: "Open the window." *Id.* at 2:20-2:22.

4

At this point (approximately ten seconds after Officer Gabster first expressly ordered him to open the door), Mr. Devaugh complied and exited the vehicle. Love BWC at 2:28-2:31. Officer Gabster appears to begin placing Mr. Devaugh in handcuffs, taking hold of Mr. Devaugh's left arm and telling him twice to "[p]ut your hands behind your back"; at the same time, Office Banks grabbed Mr. Devaugh's right arm or jacket sleeve. *Id.* at 2:31-2:33; Gabster BWC at 2:25-2:26. As he was being restrained by the two officers, Mr. Devaugh tossed away a black plastic bag, which flew some distance over the parked police SUV. Love BWC at 2:31-2:33; Gordon BWC at 2:08-2:10. The officers then finished placing Mr. Devaugh in handcuffs—though with some difficulty, as Mr. Devaugh seemed to offer some resistance. Love BWC at 2:33-3:19. As Officer Love testified, a subsequent search of Mr. Devaugh's grey SUV revealed a firearm (a .44 Magnum), a digital scale, and some quantity of crack cocaine and opiates. Tr. at 98. The discarded black plastic bag was also recovered and found to contain marijuana. *Id.* at 96–97.

### III. ANALYSIS

Two things are not meaningfully contested by the parties. First, Mr. Devaugh was undoubtedly "seized" within the meaning of the Fourth Amendment when he was surrounded by the arrest team and complied with their order to open his door. *See California v. Hodari D.*, 499 U.S. 621 (1991) (holding that a seizure requires the application of physical force or submission to an assertion of authority). Second, the police did not have probable cause to arrest Mr. Devaugh *until* he tossed away the plastic bag.[3] As a result, Mr. Devaugh can prevail here on

---

[3] In its briefing, the government focuses exclusively on whether the officers had reasonable suspicion to stop the defendant. *See, e.g.*, Gov't.'s Opp'n at 2, ECF No. 26 ("The *Terry* stop in this case was plainly proper under well-settled case law."). It has never argued that probable cause existed *before* Mr. Devaugh tossed away the bag. *See id.* at 4 ("Here, the officers

5

either of two theories: (1) if the initial stop was not based on reasonable suspicion, or (2) if the initial stop ripened into a full-blown arrest before he tossed away the bag. The Court will address each issue in turn.

### A. Was there reasonable suspicion for the stop?

#### 1. Legal Standard

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court "held that an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). For such a stop to be reasonable, "[t]he officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Id.* at 123–24 (quoting *Terry*, 392 U.S. at 27).

In reviewing whether a stop was justified, courts are "not limited to what the stopping officer says or to evidence of his subjective rationale; rather [courts] look to the record as a whole to determine what facts were known to the officer and then consider whether a reasonable officer in those circumstances would have been suspicious." *United States v. McKie*, 951 F.2d 399, 402 (D.C. Cir. 1991) (per curiam). In doing so, courts are not to engage in a "divide-and-conquer analysis" that asks whether each fact is "susceptible to an innocent explanation." *United States v. Arvizu*, 534 U.S. 266, 274 (2002); *see also United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001) ("[E]ven though a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors—especially when viewed through the eyes of an experienced officer—may."). The government ultimately

---

had probable cause to arrest *after* the defendant tossed the bag containing marijuana and certainly after he was positively identified by Officer Turner.") (emphasis added).

6

bears the burden of demonstrating that reasonable suspicion for a stop existed. *See United States v. Castle*, 825 F.3d 625, 630 (D.C. Cir. 2016).

## 2. Factors Justifying a Stop

In this case, Officer Turner testified to a variety of factors justifying an investigatory stop. First, he explained that the area was well known for a high level of drug activity. *See Wardlow*, 528 U.S. at 124 ("[W]e have previously noted the fact that the stop occurred in a 'high crime area' among the relevant contextual considerations in a *Terry* analysis."); *Edmonds*, 240 F.3d at 60 ("[T]he fact that a given locale is well known for criminal activity will not *by itself* justify a *Terry* stop; but it is among the various factors that officers may take into account."). While Officer Turner did not provide comparative statistics or define the "area" with block-by-block rigor, he explained that, over his sixteen years as an undercover officer, he had conducted a large number of assignments, including controlled buys, in the neighborhood. Tr. at 8, 62. Additionally, when pressed on the issue during cross-examination, he did identify areas in his assigned district that he would *not* describe as a high crime. *Id.* at 62–63. He also defined "high crime" with some specificity. *See id.* at 63 ("Um, you have—well, high crime or high drug? It's a difference because you have areas that are high crime but not necessarily drugs. But as far as narcotics, you have some areas that are not high narcotics areas."). In other words, Officer Turner did not merely suggest that the area "suffers from general, undifferentiated 'crime,' but that it is home to the precise type of infraction[]" that he suspected Mr. Devaugh of committing. *Edmonds*, 240 F.3d at 60.

Second, Officer Turner observed a hand-to-hand transaction between Mr. Devaugh and the alleged buyer, which was consistent with how drugs are "typically distributed in the area." Tr. at 9. Of course, as Officer Turner freely admitted, he was unable to identify the "object" or

7

"objects" that were exchanged for cash, and, as a result, such an interaction is highly "susceptible to an innocent explanation." *Arvizu*, 534 U.S. at 274. But even so, the observation would certainly contribute to a reasonable officer's suspicion. *See, e.g.*, *United States v. Garrett*, 959 F.2d 1005, 1007 (D.C. Cir. 1992) (citing an officer's observation of the passing of "a small object retrieved from inside [a] car . . . in exchange for money" as relevant).

Third, Officer Turner testified that Mr. Devaugh "walked to his vehicle" after being informed by the passerby of police presence in the area. Tr. at 18. This is considerably less probative than the "headlong flight" from police that the Supreme Court has characterized as the "consummate act of evasion." *Wardlow*, 528 U.S. at 124. And normally, an "individual has a right to ignore the police and go about his business." *Id.* at 125. Perhaps the most that can be said is that "[t]he context in which a person seeks to avoid contact with a peace officer is important." *United States v. Monsivais*, 848 F.3d 353, 360 (5th Cir. 2017). In *this* context, Mr. Devaugh's response to a warning from the passing driver is not particularly inculpatory; like the hand-to-hand exchange, it is susceptible to innocent explanation. But it is another data point that Officer Turner was entitled to consider in light of his experience.

Finally, Officer Turner observed Mr. Devaugh, "as he was walking back to that gray SUV, adjust his waistband area several times." Tr. at 19. As Officer Turner clarified, "[b]ecause of my experience and training as a police officer, that's common for somebody who's carrying a weapon or illegal firearm in their waistband area, to adjust their waistband area." *Id.* While Officer Turner's description of Mr. Devaugh's movement was not particularly specific, this kind of observation has been found relevant in reasonable suspicion and probable cause analyses. *See, e.g.*, *United States v. Moore*, 75 F. Supp. 3d 444, 449 (D.D.C. 2014) (defendant observed "adjust[ing] something around his waistband, which seemed consistent with the characteristics of

8

an armed gunman") (quotation omitted); *United States v. Lovelace*, 357 F. Supp. 2d 39, 44 (D.D.C. 2004) (defendant observed "mak[ing] reaching motions towards his waistband," which supported "a reasonable suspicion that [defendant] was secreting a weapon.").

Considering "the totality of the circumstances—the whole picture," *United States v. Cortez*, 449 U.S. 411, 417 (1981), the Court is comfortable concluding that these factors establish reasonable suspicion for a stop. *See Wardlow*, 528 U.S. at 123 (explaining that reasonable suspicion requires only a "minimal level of objective justification for the stop"); *see also United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (noting that the standard for reasonable suspicion is "significantly lower" than that of probable cause).

### 3. The Collective Knowledge Issue

There is one additional wrinkle, however. Based on the testimony at the hearing, it is doubtful that all four of these circumstances establishing reasonable suspicion were actually communicated (1) by Officer Turner to Sergeant Cardinal and (2) by Sergeant Cardinal to the arrest team. For example, when Officer Turner was asked if he told Officer Cardinal about the drive-by warning ("[T]he Feds are up the street"), he was relatively certain that he had not:

> I didn't tell him about—I don't believe I told him about the guy saying it, because like I said, it wasn't really pertinent to what was going on. It was—like I said, so I wasn't worried about him [the driver]. I was more so concerned with them being able to get in and stop your client and [the buyer], not worried about some random dude that tried to help him out and he drove off.

Tr. at 82. Similarly, Officer Turner was unsure if he had mentioned anything about the waistband adjustment. He focused instead on the basic details: the occurrence of a transaction, the parties' appearance, and their changing locations:

> **Q.** Officer Turner, I want to go back to the phone call that occurred that day. So you said that there was a seller and a buyer, correct?
> **A.** Correct.
> **Q.** Okay. And you described their clothing?

9

> **A.** Correct.
> **Q.** And you described their location?
> **A.** Correct.
> **Q.** And that was it?
> **A.** Pretty much.
> **Q.** So you were on the phone with your sergent, Sergeant Alvin Cardinal, correct?
> **A.** Correct.
> **Q.** And those were the only details about the transaction that you shared?
> **A.** Not [*sic*]—I described location, clothing description, where they walked to. I had a good deal on where they walked to. And then I described—once they came out the liquor store, where your client was and where [the buyer] was.
> **Q.** Okay. You didn't say anything about Mr. Devaugh's readjusting his waist area, right?
> **A.** I don't remember if I told him that or not.
> **Q.** Okay.
> **A.** I may have or may not have said that to Sergeant Cardinal.

Tr. at 71–72.[4]

In certain circuits, the potential lack of communication of these specific details would be of no moment, thanks to an aggressive interpretation of the so-called collective knowledge

---

[4] Office Love, on the arrest team, was also not informed of any suspicious movements or waistband adjustments:

> **Q.** Sergeant Cardinal didn't tell you that the seller made any other unusual or suspicious movements, correct?
> **A.** No.
> **Q.** You didn't hear anything about Mr. Devaugh having anything in his waist area?
> **A.** No, not that I recall.
> **Q.** You didn't hear anything about the seller adjusting his waist area?
> **A.** No, sir.
> **Q.** Nothing bulging from his waist or pockets?
> **A.** No.
> **Q.** So it was your understanding at that point in time that it was sufficient to go in, based on what you had heard about the hand-to-hand transaction?
> **A.** Yes.

Tr. at 117–18. This also suggests that Officer Turner did not mention the waistband adjustment to Sergeant Cardinal, as one would reasonably expect a sergeant to inform his or her arrest team if a target was potentially armed.

10

doctrine. *See United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002) ("[C]ommon sense suggests that, where law enforcement officers are jointly involved in executing an investigative stop, the knowledge of each officer should be imputed to others jointly involved in executing the stop."); *United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976) ("[W]e do mutually impute the knowledge of all the agents working together on the scene and in communication with each other."); *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985) ("A reviewing court may examine the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation."). But other circuits take a narrower view. *See United States v. Hussain*, 835 F.3d 307, 316 n.8 (2d Cir. 2016) ("Absent record evidence that [the first officer] communicated his suspicion or any relevant information to [the second officer] before the latter began to conduct the protective search, we will not impute his knowledge or reasonable suspicion to [the second officer] under the doctrine of collective knowledge."); *United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011) (rejecting a collective knowledge rule that would "depend solely on whether, after the fact, it turns out that the disparate pieces of information held by different officers added up to reasonable suspicion or probable cause.").

Our Circuit has not yet endorsed a particular interpretation of the collective knowledge rule. It has noted in passing that "[p]robable cause may be based on the 'collective knowledge of the police.'" *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016) (quoting *United States v. Hawkins*, 595 F.2d 751, 752 n.2 (D.C. Cir. 1978)). But as Judge Moss recently observed, "read in context, this assertion [in *Burnett*] merely reflects the well-settled rule . . . that an officer may act on a request to stop and search a suspect made by another officer—or another law enforcement agency—who had probable cause to justify the stop and search." *United States*

*v. Gorham*, 317 F. Supp. 3d 459, 471 (D.D.C. 2018); *see also United States v. Hensley*, 469 U.S. 221, 231 (1985) (holding that police officers could rely on a "flyer or bulletin" produced by other officers in order to establish probable cause, even though the arresting officers were not "themselves aware of the specific facts which led their colleagues to seek their assistance").

Here, as the passages quoted above illustrate, the record is unfortunately less than clear about which information was relayed to Sergeant Cardinal and the arrest team—and when. But there is at least some indication that Officer Turner himself recommended that the arrest team move in, based on his own firsthand observations. *See* Tr. at 75 ("[I'm g]iving them lookouts, and then at which point when I'm, like, you know, 'Move in, move in,' he's [Sergeant Cardinal] telling them to move in."). There was also this exchange:

> **Q.** What were you trying to convey to him [Sergeant Cardinal]?
> **A.** Lookouts and direction of travel, and the deal—it was a deal—I saw the deal, lookouts, direction and travel, and *I had the arrest team come in* before—
> **Q.** Okay. And the—I'm sorry to cut you off.
> **A.** Have the arrest team come in before the defendant drove off, because of the fact that I heard the statement that the guy made who pulled up beside me, so I was worried that he might leave, and I didn't want him to pull off before they moved in because at that point it involves a car chase and it would have been called off.

Tr. at 87–88 (emphasis added). This language suggests that it was Officer Turner's decision to investigate further, after he observed Mr. Devaugh returning to his vehicle. And this scenario—where the observing officer, though without necessarily articulating the specific facts or circumstances giving rise to his or her suspicions, reasonably suggests that fellow officers investigate—is enough to satisfy even the most restrictive version of the collective knowledge rule. *See Burnett*, 827 F.3d at 1114; *Hensley*, 469 U.S. at 231; *see also Massenburg*, 654 F.3d at 492 (expressing comfort with a "limited domain" for the collective knowledge doctrine: "officers acting on the information and instructions of other officers").

### B. Did the stop ripen into an arrest before the police developed probable cause?

#### 1. Legal Standard

"The point at which an investigative stop becomes an arrest is not marked with a bright line." *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017). But generally, "[a] *Terry* stop must (1) 'last no longer than is necessary to effectuate the purpose of a stop' and (2) employ 'the least intrusive means reasonably available to verify or dispel the officer's suspicion.'" *United States v. Smith*, 373 F. Supp. 3d 223, 238 (D.D.C. 2019) (quoting *Florida* v. *Royer*, 460 U.S. 491, 500 (1983) (plurality opinion)). In other words, "a stop that is unduly prolonged or intrusive transforms from an investigative stop into an arrest requiring probable cause." *Hall*, 867 F.3d at 153.

As these cases make clear, determining whether a particular stop is unreasonably intrusive is not a precise science. Of course, "the right to make . . . [an] investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "In examining the reasonableness of the force used in making a stop, courts have considered such factors as the time of day, the 'high crime' nature of the area, a tip that the suspect may be armed, furtive hand movements, flight or attempted flight, a pressing need for immediate action, and the involvement of drugs." *United States v. Clark*, 24 F.3d 299, 302 (D.C. Cir. 1994).

#### 2. Analysis

Here, the Court concludes that there were a number of factors, which, taken together, transformed the stop into an arrest.

First, Officer Lyon's display of his firearm. "The use or display of arms may, but does not necessarily, convert a stop into an arrest." *United States v. White*, 648 F.2d 29, 34 (D.C. Cir.

1981); *see also Dunaway v. New York*, 442 U.S. 200, 215 & n.17 (1979) (citing officers' drawn guns as one of "the trappings of a technical formal arrest").

Second, the officers' use of force to restrain Mr. Devaugh, including the use of handcuffs. While the introduction of handcuffs does not "automatically" take an encounter beyond the bounds of a *Terry* stop, *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 82 (D.D.C. 2015), they are "generally recognized as a hallmark of a formal arrest," *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (citing cases). *See also* 4 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 9.2(d) (5th ed. 2019) ("*Search and Seizure*") (noting that "handcuffing of the suspect is not ordinarily proper" during an investigative stop). Officers can use handcuffs without converting a stop into an arrest only when specific circumstances make it reasonable to do so, such as "when they reasonably fear for their safety or the safety of others." *Smith*, 373 F. Supp. 3d at 238; *see also United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) (approving the use of handcuffs during a *Terry* stop where it was "reasonable for officers to fear that [the suspect] had a weapon in his waistband").

Third, the number of responding officers (six) and police vehicles (two) that surrounded Mr. Devaugh vehicle and prevented him from leaving. While "blocking a vehicle generally is reasonable, and not an excessive intrusion, when the suspect is in a vehicle because of the chance that the suspect may flee upon the approach of police," *United States v. Gale*, 952 F.2d 1412, 1415 (D.C. Cir. 1992) (quoting *United States v. Hardnett*, 804 F.2d 353, 357 (6th Cir. 1986)), "sometimes the magnitude of such police activity will compel the conclusion an arrest had occurred." *Search and Seizure* § 9.2(d).

Viewed as a whole, these steps appear to the Court to have exceeded the reasonable degree of force and intrusion required. The record does not suggest that Mr. Devaugh posed "an

immediate threat to the safety of the officers or others" or was "actively resisting arrest or attempting to evade arrest by flight." *Dykes*, 406 F.3d at 720 (quoting *Graham*, 490 U.S. at 396). To the contrary, Officer Love testified that he and the arrest team did not believe Mr. Devaugh was armed. Tr. at 119 ("[If we believed he had a weapon,] we would have been a little more cautious . . ."); *compare United States v. Clipper*, 973 F.2d 944, 952 (D.C. Cir. 1992) (abrogated on other grounds) (reasoning that "the information that [the defendant] was armed made it reasonable for [the officer] to believe that it was necessary for her to draw her weapon"). Similarly, he was not aware of Mr. Devaugh making any "unusual or suspicious movements" or "adjusting his waist area." Tr. at 117–18.[5] And he affirmed that "when we approached the vehicle, he didn't at any time hide his hands from us or anything like that." *Id.* at 119; *compare Dykes*, 406 F.3d at 720 (finding handcuffing was proper to effect a *Terry* stop when the defendant "kept his hands near his waistband, resisting both the officers' commands and their physical efforts to move his hands into plain view"). When asked if "did you at any point see anything that gave you concerns about whether Mr. Devaugh might, for instance, pull a weapon on you," Officer Love only stated: "No, other than we had asked several times for him to either

---

[5] It is true that Officer Turner's observation about Mr. Devaugh's waistband adjustment would likely have been enough to warrant a concern that Mr. Devaugh was armed. But there is no evidence "that [Officer Turner] or any other officer conveyed [Officer Turner's] concern to [Officer Love or the arrest team] or directed or requested that [they] act based on that concern." *Gorham*, 317 F. Supp. 3d at 470. Thus, while there is evidence that the arrest team reasonably relied on Officer Turner's top-line directive ("move in") as justification for an investigative stop, *see* Section III.A.3 *supra*, it would be a step further—requiring an aggressive reading of the collective knowledge doctrine that this Circuit has not endorsed—to find that the officers could justify their use of handcuffs by somehow constructively relying on Officer Turner's unarticulated observation of Mr. Devaugh's waistband area. The analysis would be different if Officer Turner had specifically directed his team to use handcuffs or treat Mr. Devaugh as dangerous, which would bring the situation back within the well-settled, uncontroversial contours of the doctrine. *See Massenburg*, 654 F.3d at 492 (recognizing that an officer can act on the instructions of other officers without knowing the underlying bases for their directives).

15

roll the window down or open the door or at least react to us asking him to come out of the car. It took a little longer than normal, a normal person, I believe." Tr. at 123. While Mr. Devaugh may not have reacted instantaneously to the officers' commands, he complied relatively quickly—approximately ten seconds after Officer Gabster first instructed him to leave the vehicle. And part of the brief delay may have been due to understandable confusion on Mr. Devaugh's part—he had been ordered, by multiple officers within the span of a few seconds, to variously (1) keep his hands visible, (2) open the door, and (3) open the window.

The government argues that "the officers knew that the defendant was suspected of selling narcotics" and therefore "had sound reason to believe, then, that the defendant might be armed, and placing him in handcuffs was reasonable." Gov't.'s Post-Hearing Br. at 2, ECF No. 37. And as the government notes, our Circuit has "recognized many times that 'drugs and guns go together.'" *United States v. Johnson*, 592 F.3d 164, 169 (D.C. Cir. 2010) (quoting *United States v. Jenkins*, 928 F.2d 1175, 1179 (D.C. Cir. 1991)). Indeed, some circuits, relying on that association, have adopted a kind of *per se* rule, allowing officers to assume that anyone possessing drugs or involved in a drug transaction is armed.[6] Other courts have rejected such an absolute rule, at least as a *per se* justification for handcuffing during a *Terry* stop.[7] Although this

---

[6] *See United States v. Sakyi*, 160 F.3d 164, 168 (4th Cir. 1998) ("The indisputable nexus between drugs and guns presumptively creates a reasonable suspicion of danger to the officer."); *United States v. Jacob*, 377 F.3d 573, 579 (6th Cir. 2004) ("[O]fficers who stop a person who is reasonably suspected of carrying drugs are entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions, and to take reasonable measures to protect themselves.") (internal quotation marks omitted); *United States v. Bustos–Torres*, 396 F.3d 935, 943 (8th Cir. 2005) ("Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction.").

[7] *See United States v. Acosta-Colon*, 157 F.3d 9, 19 (1st Cir. 1998) (declining "to endorse the use of handcuffs in every investigatory stop initiated upon an articulable suspicion of drug trafficking"); *United States v. Bravo*, 295 F.3d 1002, 1017 (9th Cir. 2002) (rejecting the idea that "a suspicion that [the suspect] was involved in drug trafficking [would] have justified

16

Circuit has not directly addressed the issue,[8] the Supreme Court has instructed courts to look at "the facts and circumstances of each particular case" when deciding what degree of force is permissible. *Graham*, 490 U.S. at 396. And at least in the given context, where Officer Love has explicitly testified that he was unconcerned about Mr. Devaugh "pull[ing] a weapon," the Court declines to give the general "gun-drug" nexus much weight. *See United States v. Melendez-Garcia*, 28 F.3d 1046, 1052–53 (10th Cir. 1994) ("Drugs and guns and violence often go together, and thus this might be a factor tending to support an officer's claim of reasonableness. However, there was no evidence or testimony from the police that they had reason to believe these particular suspects had guns or were violent or that the circumstances of this particular encounter warranted the unusual intrusiveness of handcuffing the defendants during the *Terry* stop."). Finding otherwise would be to assume that police can generally escalate any drug-based *Terry* stop into a highly intrusive *quasi*-arrest without even a reasonably particular suspicion of danger. *Cf. United States v. Acosta-Colon*, 157 F.3d 9, 19 (1st Cir. 1998) (rejecting a "factually unanchored justification for placing [the suspect] in handcuffs" that would be "generalizable to virtually *every* investigatory stop involving a drug suspect").

The government offers two additional arguments that require consideration. First, it suggests that it was only *after* Mr. Devaugh tossed away the bag that the officers placed him in handcuffs—meaning that they had ample probable cause at that point to effect a full-blown

---

handcuffing him"); *United States v. Melendez-Garcia*, 28 F.3d 1046, 1052–53 (10th Cir. 1994) ("[T]he naked fact that drugs are suspected will not support a *per se* justification for use of guns and handcuffs in a *Terry* stop.")

[8] The closest our Circuit appears to come is to have noted, specifically in the *Terry*-frisk context, that "courts routinely hold that protective frisks to ensure officer safety are permissible when an officer has reasonable suspicion that the suspect committed a crime involving or associated with carrying or using a weapon." *United States v. Bullock*, 510 F.3d 342, 347 (D.C. Cir. 2007).

17

arrest. *See* Gov't.'s Post-Hearing Br. at 4. However, the Court is not convinced that this chronology is the best interpretation of the body-camera footage, which shows that the handcuffing occurred (or at least began) before Mr. Devaugh tossed away the bag. Additionally, while it is not conclusive on this point, Officer Love agreed that it was his intention, upon exiting the undercover vehicle, "to go in, get Mr. Devaugh out of the car and handcuff him." Tr. at 118.

Second, at least in its initial briefing in opposition, the government suggests that the officers saw "contraband in the SUV in plain view," apparently in reference to a green digital scale that was recovered from the center console of Mr. Devaugh's SUV. Gov't.'s Opp'n at 4, ECF No. 26. On this theory, assuming the initial approach to the vehicle was valid, the officers would be justified in seizing clearly visible illegal goods. *See Texas v. Brown*, 460 U.S. 730, 738 (1983) (plurality opinion) (explaining that "'plain view' provides grounds for seizure of an item when an officer's access to an object has some prior justification under the Fourth Amendment"). However, the viability of this theory was undermined during the suppression hearing (when Office Love candidly admitted that "I don't know if I would have readily recognized it to be a scale," Tr. at 129), and the government has not attempted to revive it. *See United States v. Pindell*, 336 F.3d 1049, 1055 (D.C. Cir. 2003) (noting that, under the plain view doctrine, the incriminating nature of the item must be "immediately apparent").

## IV. CONCLUSION

For the foregoing reasons, the Court finds that the officers exceeded the scope of a permissible *Terry* stop when they began handcuffing Mr. Devaugh. "When the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure." *United States v. Sheffield*, 799 F. Supp. 2d 22, 28 (D.D.C. 2011) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)). The government has not

offered any substantial arguments as to the inapplicability of the exclusionary rule here.[9] As a result, the physical evidence in this case—including the firearm, the digital scale, and the drugs found in the plastic bag and inside the SUV—must be suppressed. Additionally, any statement made by Mr. Devaugh after he was placed in handcuffs must also be suppressed.[10] An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: November 12, 2019                                              RUDOLPH CONTRERAS
                                                                                         United States District Judge

---

[9] In its post-suppression hearing briefing, the government, for the first time, suggested the applicability of the inevitable discovery doctrine. *See* Gov't.'s Post-Hearing Br. at 5–6. This brief argument—which Mr. Devaugh had no opportunity to address in his briefing or probe via cross-examination at the suppression hearing—is insufficient to carry "the government's burden" to "prove by a preponderance of the evidence that, even without the unlawful seizure, the evidence it seeks to admit would have been discovered anyway." *United States v. Holmes*, 505 F.3d 1288, 1293 (D.C. Cir. 2007).

[10] Mr. Devaugh had argued that "any statements made by Mr. Devaugh at the scene of his arrest subsequent to his handcuffing must be suppressed" under *Miranda v. Arizona*, 384 U.S. 436 (1966). Supp. Mot. Suppress at 20–21, ECF No. 25. The government responded that "[w]hile the Government disagrees with the defendant's position, it is not seeking to admit the defendant's statements in its case-in-chief at this time." Gov't.'s Opp'n at 4 n.1. Under these circumstances, the Court finds the government's "perfunctory" argument on this point "waived." *Johnson v. Panetta*, 953 F. Supp. 2d 244, 250 (D.D.C. 2013).